Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6000
Attorneys for Defendant

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

PABLO BADILLO,

                Plaintiff,

   -against-

LUTHERAN MEDICAL CENTER,
                Defendant.

---------------------------------------------------------------x

Pro Se
No. 07 Civ. 1388 (CM)

**Electronically Filed**

*Oral Argument Requested*

### DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Lutheran Medical Center ("LMC" or "Defendant") by and through its attorneys, Morgan, Lewis & Bockius LLP, hereby submits this Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Southern District of New York, and the individual rules of this Court.

**LUTHERAN MEDICAL CENTER**

#### General Background Information

1. Lutheran Medical Center ("LMC") is part of the Lutheran HealthCare system, an integrated healthcare delivery system that is the principal provider of community-focused health care for southwest Brooklyn. Affidavit of Fred Jordan ("FJ Aff.") ¶ 1.

2.      At all relevant times, LMC has had a Personnel Policies, Procedures and Practices Manual ("LMC's Manual") by which employees are required to abide. FJ Aff. ¶ 11; Pl. Dep. 113-15.[1]

### LMC's Health Information Management ("HIM") Department

3.      The LMC Health Information Management ("HIM") Department manages data for, and is the primary custodian of, LMC's patients' medical records and charts. Affidavit of Jeanette Clark ("JC Aff.") ¶ 1; FJ Aff. ¶ 2.

4.      The HIM Department includes employees with various titles, including Medical Records Clerks and Senior Medical Records Clerks. JC Aff. ¶ 4.

5.      The Medical Records Clerk/Senior Medical Records Clerk job titles encompass multiple functions, including the "File Clerk" function and the "Analyst" function. FJ Aff. ¶¶ 4-5; JC Aff. ¶¶ 5-6, 8; Pl. Dep. 133-34-319.

6.      The File Clerk job function within the Medical Records Clerk/Senior Medical Records Clerk job titles requires, among other things: (1) retrieving and filing medical records in advance and on demand; (2) following up to locate any missing records as necessary; (3) retrieving and filing patient charts in designated areas; (4) retrieving reports from designated locations; (5) sorting and preparing loose reports for filing in patient records; (6) researching and filing loose documents as directed; and (7) assembling medical records. Affidavit of Melissa C. Rodriguez ("MCR Aff.") Ex. 2; JC Aff. ¶ 7; Pl. Dep. 105-06.

7.      Jeannette Clark was hired as the Director of the HIM Department in March 2002. FJ Aff. ¶ 6; JC Aff. ¶ 2.

8.      As Director of the HIM Department, Ms. Clark is responsible for, among other things, the management of the day-to-day operations of the Department, and for managing the workflow and job responsibilities of departmental staff. JC Aff. ¶ 7; FJ Aff. ¶ 3.

9.      In February 2004, LMC hired Carmen Drakes as Assistant Director of the HIM Department, reporting directly to Ms. Clark. JC Aff. ¶ 41; FJ Aff. ¶ 8.

### Union: Collective Bargaining Agreement and Pay-Scales

10.     Various terms of employment of LMC employees that are members of 1199 SEIU United Healthcare Workers East ("1199 SEIU" or the "Union"), including Medical Records Clerk/Senior Medical Records Clerks in the HIM Department, are governed by the applicable collective bargaining agreement (the "CBA") between LMC and 1199 SEIU. FJ Aff. ¶ 10.

11.     Specifically, the CBA governs the minimum pay rates for the uniform job titles that are listed within the CBA. FJ Aff. ¶ 12.

---
[1] Relevant pages of Plaintiff's deposition transcript ("Pl. Dep.") are attached in numerical order to the MCR Aff. at Ex. 1.

12.     LMC and 1199 SEIU negotiate and agree on the uniform minimum pay-scales for those LMC-specific job titles that are not listed in the CBA's uniform pay-scales, such as the Medical Records Clerk and Senior Medical Records Clerk job titles (including the Analyst and File Clerk functions within those titles).  FJ Aff. ¶¶ 13-16; MCR Aff. Ex. 3.

13.     The minimum hourly pay-scales agreed upon by LMC and 1199 SEIU for the Senior Medical Records Clerk job title during 2005 to 2008 are:  (1) $15.3076 effective May 1, 2005; (2) $15.7668 effective June 1, 2006; (3) $16.2399 effective December 1, 2007; and (4) $16.721 effective December 1, 2008.  MCR Aff. Ex. 3.

### Applicable Lateral Transfer And Promotional Policies

14.     Requests for lateral transfers by union employees are governed by the "Lateral Transfer" provisions of the CBA and LMC's Manual, which allow any employee with a satisfactory work record[2] and with at least one year of service in his or her present position to request a transfer to fill a bargaining unit vacancy.  MCR Aff. Exs. 4 at Article IX, § 9, and 5.

15.     Promotional vacancies are governed by the "Promotions" provisions of the CBA and LMC's Manual, which allow any employee with a satisfactory work record and at least six (6) months of service in his/her job to be considered for a promotional vacancy.  MCR Aff. Exs. 4 at Article IX, § 8, and 5.

16.     Under the CBA and LMC's Manual, a transfer is considered a "promotion" only if:  (1) the difference in the minimum pay rates between the job occupied by the Employee and the job in which a vacancy exists is at least five dollars ($5.00) per week;" or (2) the vacancy involves an elevation within the title to a more senior job title classification, "for example, a Staff to Senior title . . . ."  MCR Aff. Exs. 4 at Article IX, § 8(d), and 6; Pl. Dep. 156.  Changes in jobs that do not meet these criteria are considered lateral transfers under the CBA.  MCR Aff. Ex. 4 at Article IX § 9.

17.     Pursuant to the CBA and LMC's Manual, when two or more employees apply for the same promotional vacancy or lateral transfer in writing, LMC must award the vacant position to the employee with "the greatest bargaining unit seniority," unless there is "an appreciable difference" in the applicants' abilities to do the job.  MCR Aff. Exs. 4 at Article IX, §§ 8(a), 9(a), and 5.

18.     An employee who is promoted -- as opposed to laterally transferred -- is entitled to "receive an increase equal to the difference between his/her prior rate and the minimum rate for the job into which he/she is promoted or ten dollars ($10.00) per week, whichever is greater."  MCR Aff. Ex. 4 at Article IX, §§ 8(b), 8(d).  However, "[i]f the new job title in which the Employee is placed is not considered a promotion . . ., the Employee shall receive either his or her present salary or the minimum rate for the new job, whichever is higher."  Id.

---

[2] An employee is considered to have a satisfactory work record if the employee has received no written notices within the past twelve months, has a satisfactory attendance record for the past twelve months, and has had a satisfactory evaluation within the last twelve months.  MCR Aff. Ex. 5; FJ Aff. ¶ 24.

19. Pursuant to LMC's Manual and Human Resources's internal recruiting procedures for filling open promotional and lateral transfer positions with current employees, the Recruiting Department does an initial prescreening of each application for minimum qualifications for the position, including whether the applicant has a satisfactory work record. MCR Aff. Ex. 5; FJ Aff. ¶ 23.

20. The Recruiting Department selects the highest seniority transfer application from among the qualified applications, and sends it to the Department Head filling the position. FJ Aff. ¶ 26.

21. The Department Head is not informed by the Recruiting Department of other applicants and only receives the application of the applicant with the next highest seniority if the applicant with the most seniority is rejected. FJ Aff. ¶ 28.

### Applicable Vacation Policies

22. Per the HIM Department's policy and procedures at the time, all vacation requests for the time frame between May 1, 2003 through August 31, 2003 had to be submitted by April 1, 2003. JC Aff. ¶ 37; MCR Aff. Ex. 8.

23. For vacation requests submitted by the deadline date, seniority prevailed only if there was a conflict in the choice of vacation time among the employees who submitted timely requests. Id.

### Applicable Rest Period Policies

24. When Ms. Clark became Director of the HIM Department, she explained to her staff that the full time staff members could choose any of the following options with respect to their daily breaks: (1) take two 15 minute breaks and a half hour lunch; (2) take one 15 minute break and a 45 minute lunch; or (3) combine the two 15 minute breaks and half hour lunch by taking a one hour lunch break. JC Aff. ¶ 31; MCR Aff. Ex. 9.

25. Plaintiff elected to take the one hour lunch break option. JC Aff. ¶ 32; Pl. Dep. 415-16.

## PLAINTIFF'S EMPLOYMENT HISTORY

### General Background Information

26. Plaintiff is a Hispanic male of Puerto Rican decent. Pl. Dep. 71.

27. Plaintiff began his employment at LMC on February 20, 1990 as a Medical Records Clerk in LMC's HIM Department, classified in the File Clerk job function within the Medical Records Clerk title. Pl. Dep. 100, 105-06; FJ Aff. ¶ 31.

28. On February 18, 1996, Plaintiff was promoted from Medical Records Clerk to Senior Medical Records Clerk. MCR Aff. Ex. 10.

29. At all times relevant, Plaintiff has been a member of 1199 SEIU. FJ Aff. ¶ 33; Pl. Dep. 116.

## Reorganization of the HIM Department

30. Plaintiff began reporting to Ms. Clark when she was hired as Director of the HIM Department in March 2002. JC Aff. ¶ 2.

31. When Ms. Clark took over LMC's HIM Department in March 2002, she observed that it did not function efficiently in several respects. JC Aff. ¶ 10.

32. Specifically, Ms. Clark observed that certain employees in the HIM Department, including Medical Records Clerks/Senior Medical Records Clerks in the File Clerk function, like Plaintiff, only regularly performed one of the duties required by that function. JC Aff. ¶ 11.

33. This problem occurred, in part, because the previous HIM Department Director had hired several new employees just prior to Ms. Clark's arrival, and the HIM Department more senior staff had off loaded their less desirable job duties, such as filing charts, to these new employees. Pl. Dep. 165; JC Aff. ¶ 16.

34. For example, Ms. Clark noted that Nellie Neira (female), a HIM Medical Records Clerk, was not performing all the duties of the File Clerk function within the Medical Records Clerk title when Ms. Clark became the HIM Department Director. JC Aff. ¶ 12. Instead, Ms. Neira was only filing records and charts, which consisted of pulling and filing medical records and providing record information in response to a record request. Id.

35. As another example, Ms. Clark noted that the only job responsibility being performed by Plaintiff when she became the HIM Director was sorting loose reports. JC Aff. ¶ 13. Sorting and filing loose reports at that time involved organizing reports, including laboratory, x-ray and other reports that were either picked-up from various departments or sent down to the HIM Department, putting them in order, locating a patient's medical chart, putting the loose reports into the patient's medical chart, and filing the medical chart. JC Aff. ¶ 14; Pl. 164, 168.

36. In order to improve workflow and productivity in the Department, Ms. Clark began to reassign responsibilities to ensure that all employees were performing all the tasks within their job function. JC Aff. ¶ 17.

37. Medical Records Clerks/Senior Medical Records Clerks in the File Clerk function, including females, were cross-trained over a period of time to perform other tasks within the File Clerk job function, such as sorting and filing loose reports and assembling charts. JC Aff. ¶ 18; MCR Aff. Ex. 11.

38. For example, Ms. Neira, who had previously only filed medical charts, was given the added job responsibility of sorting and filing loose reports and assembling charts. JC Aff. ¶ 19.

39.     As another example, Plaintiff, whose sole duty at the time Ms. Clark commenced her employment at LMC was to sort loose reports, was given the added responsibility of filing and assembling medical charts. JC Aff. ¶ 20.

40.     Ms. Clark also noticed inefficiencies in the methodology Plaintiff followed for sorting and filing of loose reports. JC Aff. ¶ 22.

41.     Patient's medical charts are filed in terminal digit order. JC Aff. ¶ 23. Terminal digits are the last two numbers of a patient's medical record number. Id. Therefore, in order to locate a patient's medical chart to file any loose reports, it is necessary to have a patient's medical record number to obtain the terminal digit number. Id.

42.     In addition, a patient may have multiple medical charts that are organized by the patient's discharge dates. JC Aff. ¶ 24. Therefore, it is also necessary to obtain a patient's discharge date in order to determine in which of the patient's medical charts the loose report should be filed. Id.; Pl. Dep. 166–67.

43.     If a loose report did not have a medical record number (and, hence, did not have the terminal digit number) and/or a discharge date, Plaintiff would look up the patient's information in the computer system to obtain the medical record number in order to ascertain the terminal digit number needed to locate the chart and/or discharge date for filing the loose reports. JC Aff. ¶ 25.

44.     Ms. Clark also observed that many of the loose reports Plaintiff worked on had patient medical record numbers (and, hence, the terminal digits were ascertainable) and discharge dates and, therefore, could be filed immediately. JC Aff. ¶ 26.

45.     However, instead of immediately filing the reports with ascertainable terminal digit numbers and discharge dates, Plaintiff would set those loose reports to the side and would spend most of his day looking up the medical record numbers and discharge dates from the loose reports that were missing that information. JC Aff. ¶ 27. This caused stacks and boxes of loose reports with medical record numbers and discharge dates to pile up and create a back-log in filing. Id.

46.     Accordingly, Ms. Clark instructed Plaintiff and other Medical Records Clerks performing File Clerk functions to immediately sort the loose reports that had medical record numbers and discharge dates into their terminal digit order and place them in a folder labeled with the current month. Pl. Dep. 199; JC Aff. ¶ 29; MCR Aff. Ex. 12. Once this was completed, Ms. Clark instructed Plaintiff and the other Medical Records Clerks performing File Clerk functions to then file the loose reports that were placed in the prior month's folders. Id.

47.     If a loose report did not have a medical record number and/or discharge date, Ms. Clark instructed the clerks to place the report in a dated and labeled folder and give it to her at the end of the day, to be sorted and filed at a later date. JC Aff. ¶ 30; MCR Aff. Ex. 12.

**Plaintiff's Performance And Disciplinary Issues During The Relevant Time Period**

48. Throughout Plaintiff's employment at LMC, he had problems with, and was counseled on accepting departmental changes, excessive use of sick days and clocking in and out of work on time. FJ Aff. ¶ 35; MCR Aff. Exs. 13 and 14.

49. Plaintiff's performance issues worsened after Ms. Clark assumed management of the HIM Department and began redistributing the employees' work assignments. FJ Aff. ¶ 35; JC Aff. ¶ 33.

50. Ms. Clark verbally counseled Plaintiff on multiple occasions -- including on August 19, 2002, October 22, 2002, October 28, 2002, November 5, 2002, December 2002, January 21, 2003 and February 27, 2003 -- on his failure to follow her directions concerning the new system she had implemented for filing loose reports and his unsatisfactory work performance. JC Aff. ¶ 34; MCR Aff. Ex. 15.

51. On March 7, 2003, Plaintiff was issued a written warning notice for failing to file loose reports in accordance with Ms. Clark's instructions, failing to treat Department of Health reports as a priority, and for failing to sort and file reports and records on the numerous occasions between August 2002 and February 2003. MCR Aff. Ex. 15; JC Aff. ¶ 35.

52. Plaintiff received an overall rating of "Below Expectations" on his June 2003 annual performance evaluation and was counseled to improve on various aspects of his performance and workplace behavior. JC Aff. ¶ 39; MCR Aff. Ex. 16.

53. On July 3, 2003, Plaintiff submitted an untimely request for vacation for July 7 to July 18, 2003 and July 20, 2003. JC Aff. ¶ 38; MCR Aff. Ex. 26. Plaintiff's request was denied because it was untimely and another employee had submitted a timely request for the same time period requested by Plaintiff and was already granted the time off. Id.

54. Once Ms. Drakes was hired as Assistant Director of the HIM Department in February 2004, Ms. Drakes became Plaintiff's immediate supervisor. JC Aff. ¶ 41.

55. Plaintiff received an overall "Meets Standards" evaluation rating on his June 2004 annual performance evaluation by Ms. Drakes. MCR Aff. Ex. 17; JC Aff. ¶ 42.

56. On October 11, 2004, Ms. Clark gave Plaintiff an Oral Counseling Report for failing to inform his direct supervisor, Ms. Drakes, that he was leaving his workstation, which caused a co-worker to have to delay her scheduled lunch and pushed back the entire schedule. MCR Aff. Ex. 18; JC Aff. ¶ 43.

57. Ms. Clark verbally counseled Plaintiff on several occasions about his failure to show up for scheduled overtime shifts. JC Aff. ¶ 44; MCR Aff. Ex. 19.

58. On April 27, 2005, Ms. Clark gave Plaintiff a written memorandum documenting the oral counseling he received on April 25, 2005 for failing to show up for his scheduled overtime shift on April 23, 2005. JC Aff. ¶ 46; MCR Aff. Ex. 19.

59.     On May 11, 2005, Plaintiff received a three day suspension for failing to follow Ms. Clark's directive to immediately pull the medical charts that a physician urgently needed to review before leaving on vacation that day. JC Aff. ¶ 47-50; Pl. Dep. 451-52.

60.     Plaintiff was also counseled on several occasions -- including on May 23, 2006 and June 6, 2006 -- for failing to arrive to his work station on time and for failing to notify the department that he was going to be late. MCR Aff. Ex. 20; JC Aff. ¶¶ 51-53.

61.     During this same period, Ms. Clark verbally counseled Plaintiff about leaving his workstation while not on break or without permission. JC Aff. ¶ 51.

62.     For example, on December 6, 2006, Plaintiff was issued a memorandum counseling him about leaving his workstation outside break time and without permission. JC Aff. ¶ 54; MCR Aff. Ex. 21.

### Plaintiff's 2004 Application For A Lateral Transfer

63.     On March 30, 2004, Plaintiff submitted a transfer request form for an Analyst function within the Medical Records Clerk/Senior Medical Records Clerk job titles that would report directly to Ms. Clark. MCR Aff. Ex. 22; Pl. Dep. 324; JC Aff. ¶ 55.

64.     The Analyst function was ultimately filled in April 2004 by Lisa Mecklosky-Donate, a Hispanic female, who had seven more years of seniority than Plaintiff and comparable job skills. Pl. Dep. 28, 335; FJ Aff. ¶ 36; JC Aff. ¶ 55.

65.     Pursuant to the CBA and LMC's policies, Plaintiff's application was screened out by the Recruiting Department on the basis that a more senior applicant who met the qualifications had applied for the Analyst function. FJ Aff. ¶ 37; MCR Aff. Ex. 23.

66.     Since she was presented with, and hired, the most senior applicant for the position (Ms. Mecklosky-Donate), Ms. Clark was not even aware that Plaintiff had applied for a transfer to the Analyst function in 2004. FJ Aff. ¶ 38; JC Aff. ¶ 55.

### Plaintiff's 2005 Application For A Lateral Transfer

67.     Plaintiff again applied for a transfer to the Analyst function within the Medical Records Clerk/Senior Medical Records Clerk job titles when the function became available in June 2005 after Ms. Mecklosky-Donate resigned. JC Aff. ¶ 56; FJ Aff. ¶ 39; MCR Aff. Ex. 24.

68.     Since, Plaintiff was qualified for the function and was the most senior applicant, his transfer application was sent to Ms. Clark, who interviewed him, and offered him the position. Pl. Dep. 347, 349; FJ Aff. ¶ 40; JC Aff. ¶ 57; MCR Aff. Ex. 25.

69.     At the time Plaintiff applied for and received the lateral transfer to the Analyst function, his hourly rate as a Senior Medical Records Clerk was $16.24, which was well above the union negotiated minimum hourly job rate of $15.3076 for the Senior Medical Records Clerk job title, including the Analyst function. FJ Aff. ¶ 41; MCR Aff. Ex 27.

### Plaintiff's Complaints Concerning Ms. Clark

70. Plaintiff has lodged various complaints about Ms. Clark's management style with LMC's Human Resources Department and the Union. Pl. Dep. 367-69.

71. Plaintiff admitted he never complained about race or gender discrimination to LMC's Human Resources Department or the Union at any time prior to requesting a transfer and receiving the lateral transfer to the Analyst Function. Pl. Dep. 368-69.

### PLAINTIFF'S EEOC CHARGE AND COMPLAINT

72. On July 24, 2006, Plaintiff filed a charge of discrimination with the Equal Opportunity Commission against LMC. MCR Aff. Ex. 28.

### PLAINTIFF'S ADMISSIONS

73. Plaintiff admitted that the only LMC employee he alleges discriminated against him was Ms. Clark. Pl. Dep. 477, 499-500.

74. Plaintiff admitted that he was not discriminated against on the basis of his race. Pl. Dep. 299-301.

75. Plaintiff admitted that he was not retaliated against with respect to his pay because he filed his EEOC charge or because of any alleged complaints of gender discrimination. Pl. Dep. 367-69.

Dated: New York, New York
       August 12, 2009

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:_____
   Debra Morway
   Melissa C. Rodriguez
101 Park Avenue
New York, New York 10178
(212) 309-6000
*Attorneys for Defendant Lutheran Medical Center*